# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KATHLEEN M. SCHOCK,

     Plaintiff,

     v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

     Defendant.

No. 14 C 4606

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Kathleen M. Schock filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 *et seq*. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Plaintiff has filed a request to reverse the ALJ's decision and award benefits. Alternatively, she requests that this Court reverse the decision and remand for additional proceedings. For the reasons stated below, the Commissioner's decision is reversed and remanded.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on October 27, 2010, alleging that she became disabled on May 16, 2010, due to fibromyalgia, osteoarthritis, herniated discs, sleep apnea, high blood pressure, irritable bowel syndrome, plantar fasciitis, depression, and allergies. (R. at 19, 100, 246). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 19, 100–01, 105–108, 113–115, 117). On October 31, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 19, 34–99). The ALJ also heard testimony from Ashok Jilhewar, M.D., a medical expert (ME), and Jeffery W. Lucas, a vocational expert (VE). (*Id.* at 19, 34–99, 203, 205).

The ALJ denied Plaintiff's request for benefits on November 29, 2012. (R. at 19–28). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since May 16, 2010, the alleged onset date. (*Id.* at 21). At step two, the ALJ found that Plaintiff's obesity, fibromyalgia, diabetes mellitus, status post cervical fusion, obstructive sleep apnea, and degenerative disc disease are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 23).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she can perform sedentary work "except she cannot climb ladders, ropes, or scaffolding. She can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She can perform frequent but not constant handling, fingering, and reaching bilaterally." (R. at 23). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is able to perform her past relevant work as a manager of a financial institution as that job is generally performed in economy. (*Id.* at 27). Accordingly, the ALJ concluded that Plaintiff is not suffering from a disability, as defined by the Act. (*Id.*).

The Appeals Council denied Plaintiff's request for review on April 15, 2014. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in gen-

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

eral, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks eviden-

tiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

### A. Treating Sources

Plaintiff experienced symptoms of fibromyalgia starting in 2004. (R. at 429). In September 2007, Plaintiff began treating with Angela Maier, M.D., at the Edward Medical Group. (*Id.* at 371). Dr. Maier diagnosed hypertension, GERD, fibromyalgia, and menopausal syndrome. (*Id.*). In March 2009, Plaintiff sought treatment for fibromyalgia and osteoarthritis, while also reporting dizziness and increased stress. (*Id.* at 309). On examination, Dr. Maier found musculoskeletal tenderness and rotator cuff tendinitis. (*Id.*). At a follow-up with Dr. Maier on January 4, 2010, Plaintiff reported persistent back pain. (*Id.* at 381). Dr. Maier diagnosed fibromyalgia, hypertension, and possible menopausal symptoms. (R. at 382). She prescribed phentermine[3] and increased a previously prescribed Premarin dosage.[4] (*Id.*).

On February 1, 2010, Plaintiff reported continued minor aches and pressure in the back, but noted that Premarin seemed to help. (R. at 379, 380). On May 4, Plaintiff reported that her lower back pain was 6/10. (R. at 373). Dr. Maier pre-

---

[3] Zantryl (phentermine) is a stimulant used as an appetite suppressant. <www.drugs.com>

[4] Premarin (conjugated estrogens) is used to treat menopausal symptoms. <www.drugs.com>

scribed Darvocet, and told her to continue to use Alieve and Tylenol for the pain.[5] (R. at 373–74). Dr. Maier also began to wean Plaintiff off phentermine, and opined that she should diet and exercise. (R. at 374). On June 25, 2010, Dr. Maier noted she was to discontinue use of phentermine. (R. at 353). By then, she was taking Cymbalta.[6] (*Id.*).

On July 22, 2010, Plaintiff began treating with Jeffery Pua, M.D. (R. at 350). Plaintiff reported three weeks of worsening abdominal pain that radiated to the right mid-back, and reached a pain level of 8/10. (*Id.*). She remarked that the pain was so severe she could not sit, but could only stand. (*Id.*). On August 8, Plaintiff reported that her back pain was now 10/10, with stabbing pain that worsens with movement. (R. at 347). Plaintiff also reported abdominal pain and lower back pain. (R. at 348). For her lower back pain, Dr. Pua prescribed prednisone and referred Plaintiff to physical therapy.[7] (*Id.*). Regarding her abdominal pain, Dr. Pua observed that Plaintiff's CT scan was negative and her pain is likely radiating from her right back. (R. at 348–49). Dr. Pua found single point tenderness in her right mid-back to the right of T-11, likely from muscle spasms or a herniated disc. (R. at 348). He referred her to physical therapy, prescribed Soma[8] and Relafen,[9] and or-

---

[5] Darvocet contains propoxyphene, a narcotic pain reliever, and acetaminophen, a less powerful pain reliever. It is used to treat mild to moderate pain. <www.drugs.com>

[6] Cymbalta (duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor antidepressant used to treat fibromyalgia, depression, and anxiety. <www.drugs.com>

[7] Prednisone is a corticosteroid that is used as an anti-inflammatory or an immunosuppressant medication. <www.drugs.com>

[8] Soma is a muscle relaxer that relieves pain and is used to treat musculoskeletal conditions. <www.drugs.com>

dered an MRI. (*Id.*). Plaintiff's August 25, 2010 MRI revealed spondyloarthritis with multilevel bulge endplate spurs and facet hypertrophy. (R. at 365).

On March 14, 2011, Plaintiff began treating with pain specialist Firdaus Hashim, M.D., for bilateral back pain and anterior chest, rib, and abdominal pain. (R. at 476). The bilateral low back pain was worse on the right side than the left, with extremity radiation to the knee; the pain was 6/10, but could get as bad as a 10/10. (*Id.*). The right side abdominal pain reached a level of 6/10. (*Id.*). The pain, which Plaintiff described as a throbbing sensation, had progressively gotten worse and was present throughout the day. (*Id.*). Plaintiff had troubling sleeping, had become frustrated and depressed, and was increasingly less active. (*Id.*). She had tried physical therapy but could not continue treatment because it exacerbated her fibromyalgia. (*Id.*). Dr. Hashim observed a range of motion within normal limits and slight tenderness on the right L5-S1 facet and SI joints. (*Id.* at 477). Dr. Hashim determined that Plaintiff was a candidate for injective therapy. (*Id*). He noted that her MRI showed disc bulges at the L3-4 and L4-5 levels "more on the left side" but the Plaintiff's symptoms were more on the right side. (*Id.*). He opined that she might have right sacroiliac joint (SI) dysfunction and L5-S1 facet dysfunction that is causing the right side pain. (*Id.* at 478). Plaintiff reported receiving some benefits from Relafen, but it also caused headaches. (*Id.* at 477). Dr. Hashim prescribed Mobic

---

[9] Relafen (nabumetone) is an NSAID, which works by reducing hormones that cause inflammation and pain in the body. <www.drugs.com>

and Nucynta, and provided Plaintiff with Flector Patches.[10] (*Id.*). Dr. Hashim directed Plaintiff to schedule follow-ups for right SI joint and L5-S1 facet injections every two weeks. (R. at 478).

On March 21, 2011, Plaintiff received her first injection. (R. at 474). On April 4, she reported that the first injection resulted in a 60% reduction in pain for two to three days, but the pain subsequently returned. (*Id.* at 472). Dr. Hashim performed a second injection but noted that if there was no benefit she would consider a right L4-5 lumbar epidural injection instead. (*Id.*). On April 11, Plaintiff reported no benefit from the second injection. (*Id.* at 469). Plaintiff reported that she could not tolerate Mobic due to upset stomach and Dr. Hashim discontinued its use. (*Id.* at 470). Dr. Hashim continued Nucynta, but also noted that the medicine is a narcotic only for short-term use until the etiology of the pain could be addressed. (*Id.*). She discussed the option of lumbar epidural injections at the L4-5 level to address discogenic pain. (*Id.* at 471). However, Plaintiff was unable to schedule further injections due to financial issues. (*Id.*). On July 25, Plaintiff returned to Dr. Hashim for medicine titration. (*Id.* at 463). She reported lower back pain of 7/10, with right hip, buttock, and lower extremity radiation to the right knee at a 7/10 level. (*Id.*). She also reported abdominal pain at a 9/10 level. (*Id.*). Plaintiff reported that the Flexeril caused her to sleep for two days. (R. at 464). Dr. Hashim discontinued Flexeril and prescribed Robaxin.[11] (*Id.*). On November 7, Plaintiff returned to Dr.

---

[10] Mobic (meloxicam) and Flector Patches (diclofenac) are NSAIDs. Nucynta (tapentadol) is an opioid narcotic used to treat moderate to severe pain. <www.drugs.com>

[11] Robaxin (methocarbamol) is a muscle relaxer used to treat pain. <www.drugs.com>

Hashim for a medication follow-up. (*Id.* at 509). She reported lower back pain at a 7/10 level, with right hip, buttock, and lower extremity radiation to the right knee at a pain level of 5/10. (*Id.*). She also reported abdominal pain at a 3/10 level and thoracic pain at a 4/10 level. (*Id.*). Dr. Hashim's diagnosed paraspinous muscle spasms causing thoracic area pain, fibromyalgia, anxiety, and depression. (*Id.* at 510). Dr. Hashim continued Robaxin and Nucynta, noting that the latter was creating some memory problems. (*Id.*).

On May 15, 2012, Plaintiff began treating with Kristen Donigan, D.O. (R. at 629). Plaintiff reported difficulty sleeping and back pain. (*Id.*). Dr. Donigan diagnosed fibromyalgia. (*Id.* at 631). She prescribed amitriptyline for chronic pain and Metformin to treat diabetes mellitus.[12] (*Id.* at 632). On June 5, Plaintiff reported insomnia related to pain. (*Id.* at 626). She was tolerating the amitriptyline, but was "foggy" when she first started taking it. (*Id.*). Dr. Donigan determined that there was no clear improvement of pain. (*Id.*). She diagnosed fibromyalgia and increased the amitriptyline dosage. (*Id.* at 628). Plaintiff also reported stomach upset from the Metformin, for which Dr. Donigan recommended Imodium. (*Id.*).

On July 3, 2012, Plaintiff complained of insomnia and worsening pain in her shoulders. (R. at 622). She reported that the amitriptyline did not help with the pain or insomnia as intended. (*Id.*). Instead, she was feeling more anxious and jittery. (*Id.*). Dr. Donigan determined that Plaintiff has sleep apnea but cannot use a

---

[12] Amitriptyline is a tricyclic antidepressant the can be used to treat fibromyalgia. <www.webmd.com> Metformin is a diabetes medication used to control blood sugar levels. <www.drugs.com>

CPAP device because of claustrophobia. (R. at 623). Plaintiff reported continuing difficulty tolerating Metformin as it increased her symptoms of irritable bowel syndrome. (*Id.*). Dr. Donigan diagnosed fibromyalgia, depression, and anxiety, weaned her off amitriptyline and started Effexor.[13] (*Id.*). Dr. Donigan also recommended she start a trial of melatonin and "possibly" valerian to treat insomnia.[14] (*Id.*). On July 17, 2012, Plaintiff complained of intense shoulder pain. (*Id.* at 617). She stated that melatonin helped with sleep. (*Id.*). Dr. Donigan opined that the shoulder pain might be fibromyalgia but should rule out inflammatory process. (*Id.* at 618). She ordered a rheumatoid arthritis factor. (*Id.* at 620). She diagnosed fibromyalgia, depression, shoulder pain, and insomnia, increased the Effexor dosage, and noted that Plaintiff was almost weaned from sertraline and amitriptyline. (*Id.* at 618).

On August 17, 2012, Plaintiff reported continuing shoulder pain, which is worse during the mornings, rainy weather, and after physical therapy. (R. at 603). She did not notice much improvement from the increased dosage of Effexor. (*Id.*). Dr. Donigan opined that Plaintiff's chronic joint pain could be from polymyalgia rheumatica, though the lab work did not support this assessment. (*Id.* at 604). Dr. Donigan referred Plaintiff to a rheumatologist and titrated the Effexor. (*Id.*).

On September 25, 2012, Plaintiff saw rheumatologist Francis Lichon, M.D. (R. at 521). Plaintiff reported "some terrible pain in her arms, upper back, and neck." (*Id.*).

---

[13] Effexor is a selective serotonin and norepinephrine reuptake inhibitor used to treat depression, anxiety, and fibromyalgia. <www.webmd.com>

[14] Melatonin is a form of a hormone used to treat insomnia. Valerian root is used as an alternative medicine to treat insomnia. <www.drugs.com>

She reported that Effexor only slightly helped with her aches and pains. (*Id.* at 521) On examination, Dr. Lichon found hypertension, diabetes mellitus, obesity, insomnia, irritable bowel syndrome, and low energy level. (*Id.* at 521–22). Dr. Lichon also found that Plaintiff had "trigger points present in her upper back, shoulders, and arms, typical of fibromyalgia." (*Id.* at 522). He diagnosed chronic low back pain, degenerative disc disease, fibromyalgia, irritable bowel syndrome, high blood pressure, adult-onset diabetes, and obesity. (*Id.*). Dr. Lichon also concluded that her "borderline" sedimentation rate may indicate polymyalgia rheumatica, but believes her "main aches and pains are all fibromyalgia." (*Id.*). He recommended ruling out polymyalgia rheumatic. (*Id.*). He increased the Effexor dosage and added Flexeril. (*Id.*). Dr. Lichon stressed that Plaintiff should be exercising and dieting, indicating that this would "go a long way to get [her] condition to improve." (*Id.*).

## B. Plaintiff's Testimony

In an adult function report completed on March 8, 2011, Plaintiff asserted that she has difficulty standing or sitting for long periods of time, cannot lift boxes or files, finds it difficult to reach overhead, has pain when bending over, and experiences pain in her right hand, arm, and elbow which limits computer use. (R. at 262). She can only walk "7 houses away" before needing to stop and rest for at least fifteen minutes. (*Id.* at 267). Lifting, squatting, bending, reaching, and kneeling are so painful they can only be done for minutes. (*Id.*). She can sit and stand for longer, depending on the day (*Id.*). She is able to do some household chores with assistance and rest periods. (*Id.* at 264). She cannot shop for clothes and food for long unless

she has a scooter. (*Id.* at 265). She reported difficulty and pain while performing grooming activities that require bending or reaching. (*Id.* at 263). Plaintiff's fibromyalgia causes pain that affects her sleep, which in turn exacerbates the pain. (*Id.*). She has to rest in the afternoon due to fatigue and back pain. (*Id.* at 272). She is able to pay attention for at least an hour, can follow written instructions very well, and can follow spoken instructions very well unless experiencing a "fibro fog." (*Id.* at 267).

Plaintiff completed a second disability report on July 25, 2011. (R. at 298). She reported back spasms, more back pain, and soreness in her arms and hips as changes in her condition since her last report on February 14, 2011. (*Id.*). Plaintiff also asserted that the pain medication makes her tired, and she cannot think "as clearly as [she] would like" because of them. (*Id.*). She reported being more off balance, dizzy, and clumsy, and speculated that these symptoms are also attributable to the pain medication. (*Id.* at 302).

Plaintiff completed a third disability report on January 27, 2012. (R. at 318). Since her previous report in July 2011, her fibromyalgia pain and fatigue had increased. (*Id.*). She noted that most of the severe pain is in her shoulders and arms, but can also occur in her knees, hips, and along the sides of her body. (R. at 321). When she goes to the store, she must use a scooter because fibromyalgia causes pain and fatigue. (*Id.* at 318). During severe bouts of fibromyalgia, Plaintiff asserted that she is overcome with fatigue and needs assistance with personal grooming and

household tasks. (*Id.* at 321). She cannot sit in a chair for more than one-half hour and requires long rest periods due to fatigue. (*Id.* at 322).

At the October 31, 2012 hearing, Plaintiff testified that while she was working, she had difficulty using a computer mouse and keyboard because of numbness and tingling in her hands. (R. at 62). She also had pain from fibromyalgia while reaching overhead for binders or manuals. (Id. at 49). Plaintiff has the most severe pain from fibromyalgia in her elbows and shoulders. (Id. at 49–50). She described the pain in her shoulders as constant, worsening when stressed. (Id. at 61). There is a burning sensation in her hips and a "deep soreness" in her arms. (Id. at 50). On a typical day, her pain reaches 6–7/10. (Id.. at 52). She had difficulty tolerating Cymbalta and Celebrex.15 (Id. at 66). Some anti-inflammatory drugs have helped manage the pain and anti-depressants have helped treat fibromyalgia and depression. (Id. at 50). She experiences grogginess, sleepiness, and "a little confusion" as side effects from the medicine. (Id.. at 53). When she is stressed or in extreme pain, she has "a little difficulty concentrating." (R. at 65). She stretches in the morning, but has not increased her level of exercise as recommended by the rheumatologist. (R. at 51). Though the doctor suggested aqua therapy, she is unable to afford the treatment. (R. at 51–52).

Plaintiff testified that she is able to sit for a period of twenty minutes to "more than an hour," but can only remain standing for a few minutes. (R. at 59–60). She is able to do household chores with the assistance of her husband, who helps her with

---

[15] Celebrex is a NSAID. <www.drugs.com>

tasks requiring lifting heavy items, twisting, or bending. (Id. at 57). Sometimes she requires his assistance putting on her robe in the morning, using shampoo, and getting in and out of the shower. (*Id.* at 55, 65).

# V. DISCUSSION

Plaintiff contends that the ALJ's decision is not supported by substantial medical evidence because the ALJ (1) failed to include nonexertional limitations in the RFC, (2) failed to conclude Plaintiff's mental impairments are severe and should be considered in the RFC, and (3) erred in finding Plaintiff's allegations not fully credible. (Dkt. 12 at 7–13; Dkt. 21 at 1–5).

## A. The ALJ Should Re-evaluate Plaintiff's Credibility in Light of SSR 16-3p

While the Court will rely on the new guidelines concerning credibility, SSR 16-3p, the Court is also bound by case law concerning former SSR 96-7p and its "credibility" analysis.[16] The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider

---

[16] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (internal citations omitted); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

With the recent issuance of SSR 16-3p, the Social Security administration has updated its guidance on evaluating symptoms in disability claims, eliminating the term "credibility" from its sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character. SSR 16-3p, 2016 WL 1119029 at *1 (effective March 28, 2016). While the new policy statement does apply to matters on appeal, the Court is also bound by case law concerning the same regulatory process under the "credibility" analysis of the former SSR 96-7p. *See Hagberg v. Colvin*, No. 14 C 887, 2016 WL 1660493, at *6–8 (N.D. Ill. Apr. 27, 2016); *Pietruszynski v. Colvin*, No. 14 C 2148, 2016 WL 1535158, at *6 & n.6 (N.D. Ill. Apr. 14, 2016).

whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 416.929(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("[T]he administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony.").

Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support the claimant. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 16-3p, and former SSR 96-7p, require the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by

treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted). The Court will uphold an ALJ's evaluation of symptoms if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 940.

Plaintiff testified that she suffers both pain and fatigue. She is able to stand for only a few minutes, can sit for 30 minutes to "more than an hour," depending on the type of chair she uses, and can walk a distance of "seven houses" before needing to rest. (R. at 59–60). She experiences "daily" fatigue, and has "chronic" pain in her shoulders and arms. (*Id.* at 60, 64). Her symptoms have gotten worse over time. (*Id.* at 53). The ALJ did not find these allegations credible because (1) Plaintiff had a nonmedical reason for leaving her last job; (2) her allegations of back pain were inconsistent with her activities of daily living; (3) her impairment was longstanding but her treatment was conservative and; (4) she testified to medication side effects, but no significant side effects were noted in her medical history. (*Id.* at 25).

Under the circumstances, none of the reasons provided by the ALJ for rejecting Plaintiff's credibility are legally sufficient or supported by the substantial evidence. First, the ALJ cannot rely on Plaintiff's nonmedical job termination that occurred almost two years prior to her alleged onset date to discredit her allegations of pain

and fatigue. (R. 25). Plaintiff's job termination in December 2008 is too far removed from the alleged onset date in May 2010 to be relevant. *See¸ e.g.*, *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) ("[Plaintiff's] physical abilities a year before the alleged onset date therefore tell us little if anything about the credibility of her later complaints of disabling pain.").

The Commissioner relies on *Diaz v. Charter*, 55 F.3d 300, 308 n.4 (7th Cir. 1995), to argue that "the ALJ is entitled to consider the reason Plaintiff stopped working in [making a credibility determination]." (Dkt. 20 at 6). However, in *Diaz*, the Seventh Circuit found the ALJ's reasoning compelling because the time between being laid off and the onset date was only one month. 55 F.3d at 304. Here, to the contrary, Plaintiff was laid off almost two years prior to her onset date. (R. at 246).

Second, the ALJ incorrectly relies on the fact that Plaintiff had sleep apnea during her previous employment to improperly discredit claims made after the alleged onset date. *See* R. at 25 ("Also, although I recognize that there is no sleep study in the record, I am giving [Plaintiff] the benefit of the doubt and finding it to be a severe impairment. I further note that she had this impairment prior to her alleged onset date and was still able to work at a skilled job."). The Seventh Circuit has observed that when a claimant for disability insurance benefits works this does not necessarily mean she is not disabled: "A desperate person might force himself to work despite an illness that everyone agreed was totally disabling." *Hawkins v. First Union Corp. Long–Term Disability Plan,* 326 F.3d 914, 918 (7th Cir. 2003). "Yet even a desperate person might not be able to maintain the necessary level of

effort indefinitely." *Id.*; *see Eichhorst v. Colvin*, No. 13 C 7635, 2015 WL 3747267, at *7 (N.D. Ill. June 15, 2015). Further, the ALJ does not take into account that Plaintiff's combination of symptoms may have worsened considerably in the two-year interim between being able to work with sleep apnea and her alleged onset date.

Third, the ALJ erroneously placed undue weight on Plaintiff's activities of daily living. In her decision, the ALJ concluded that Plaintiff's activities of daily living indicate that her allegations of disabling limitations are not credible:

> [A]lthough [Plaintiff] alleges limited activities of daily living, she complained of back pain after she was vacuuming in June 2011 and went swimming in a lake in August 2011. She testified she likes to swim in the summer. She can also concentrate enough to read, pay bills, and surf the Internet.

(R. 25) (citations omitted). While it is permissible for an ALJ to consider a claimant's daily activities when assessing credibility, the Seventh Circuit has repeatedly admonished ALJs not to place "undue weight" on those activities. *Moss*, 555 F.3d at 562; *see Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern workplace."); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically be-tween home and office or factory or other place of paid work."). Further, when an ALJ does analyze a claimant's daily activities, the analysis "must be done with care." *See Roddy v. Astrue,* 705 F.3d 631, 639 (7th Cir. 2013).

Although Plaintiff reports paying the bills, reading, and surfing the Internet, the ALJ does not explain how these limited activities impugn Plaintiff's credibility and indicate an ability to perform full-time work. *See Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011) ("[An ALJ] must explain perceived inconsistencies between a claimant's activities and the medical evidence."); *see also Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (ALJ failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week). Further, it is not clear why an injury sustained from vacuuming undermines Plaintiff's credibility. While the ALJ found that Plaintiff's ability to swim undermines her alleged symptoms of pain and fatigue (R. at 25), the ALJ failed to account for the ME's testimony that "non-weight bearing exercises" like swimming are "adequate treatments" for Plaintiff's "symptom of pain and diagnosis of fibromyalgia syndrome" (*id*. at 86). In the same paragraph criticizing Plaintiff for swimming, she also admonished Plaintiff for her *lack* of exercise: "The rheumatologist she consulted with told her to exercise more which she does not appear to be doing." (R. at 25).

Fourth, the ALJ's contention that Plaintiff's "treatment since the alleged onset date has been mainly conservative" (R. at 25) is belied by the medical evidence. In fact, Plaintiff made over 30 doctor visits after her alleged onset date. (R. at 341, 344, 347, 350, 357, 365, 458, 463, 469, 472, 474, 476, 483, 488, 491, 494, 497, 506, 512, 521, 530, 533, 552, 555, 557, 579, 581, 584, 586, 658). She has also been prescribed numerous drugs in an effort to control or alleviate her symptoms. (*See*, *e.g.*, *id*. at

354 (Cymbalta), 348 (Tramadol), 342 (Sertraline), 477 (Relafen, Mobic, Flector, Vicodin, and Nucynta), 370 (Effexor), 463 (Flexeril), 464 (Robaxin)). Plaintiff also treated with Dr. Hashim, a pain specialist, during multiple visits and two epidural injections. (*Id.* at 463, 466, 469, 472, 474, 476, 477 509, 512). Even if this treatment could be considered "conservative," the ALJ must consider the "possible reasons" an individual may not have pursued further treatment. SSR 16-3p, at *8; *see also Shauger v, Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."). For example, on occasion financial difficulties made it difficult for Plaintiff to continue her pain medications. (R. at 465–68); *see* 16-3p, at *9 ("An individual may not be able to afford treatment and may not have access to free or low-cost medical services.").

Finally, the ALJ's determination that "there are no significant side effects noted in [Plaintiff's] medical records" (R. at 25) is contrary to the medical evidence. The record indicates—and the ALJ ignores—that Plaintiff's doctors systematically changed her medication regimen in an effort to find a drug that could adequately control her symptoms without producing undesired side effects. (*See, e.g.*, R. at 477 (noting that Relafen causes headaches and Vicodin causes vomiting), 470 (discontinued Mobic due to upset stomach), 464 (Flexril "made her sleep for two days"), 510 (noting Nucynta has "good benefit but [causes] some memory deficits"), 626 (noting an allergy to Celebrex, nausea with Tramadol, increased anxiety with amitripty-

line)). "The ALJ must accept the evidence of Plaintiff's medication side effects and incorporate them into her analysis and 'explain why it was rejected.'" *Indoranto*, 374 F.3d at 474.

The Court finds the ALJ's credibility determination "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## B. Other Issues

Because the Court is remanding to reevaluate Plaintiff's credibility, the Court chooses not to address Plaintiff's other arguments that the ALJ failed to include non-exertional limitations in the RFC, and failed to conclude that Plaintiff's mental impairments are severe and should be considered in the RFC. (Dkt. 12 at 7–12; Dkt. 21 at 1–4). However, on remand, after determining Plaintiff's credibility, the ALJ shall reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted). Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

# VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [11] is **GRANTED**, and Defendant's Motion for Summary Judgement [19] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: September 14, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge